### Alan HAMILTON and Robert Barnhart, Plaintiffs,

v.

### The CITY OF AUSTIN, Bruce Babbitt, Secretary, Department of the Interior; and Jamie Rappaport Clark, Director of the U.S. Fish & Wildlife Service, Defendants.

### No. A 98 CA 317 SS.

United States District Court,
W.D. Texas,
Austin Division.

June 16, 1998.

---

8. *Chevron U.S.A., Inc. v. Aguillard*, 496 F.Supp. 1038 (M.D.La.1980).

9. *Newsom v. Zurich, Ins. Co.*, 397 F.2d 280 (5th Cir.1968).

Robert Dartanian Thomas, Hohmann & Taube, Robert Dartanian Thomas, Hall, Johnson & Kleeman, Robert J. Kleeman, Hall, Johnson & Kleeman, Austin, TX, for plaintiffs.

Dana K. Johnson, Assistant City Attorney, Austin, TX, for defendant City of Austin. Lyn Jacobs, U.S. Dept. of Justice, Environment & Natural Resources, Washington, DC, for defendants Bruce Babbitt, Secretary, Department of the Interior, Jamie Rappaport Clark, Director of the U.S. Fish & Wildlife Service.

## MEMORANDUM OPINION AND ORDER

SPARKS, District Judge.

### Synopsis

*Barton Springs is a true Austin shrine,*
*A hundred years of swimming sublime.*
*Now the plaintiffs say swimmers must go*
*'Cause of "stress" to critters, 50 or so.*

*They want no cleaning 'cause of these bottom*
*feeders*
*Saying it's the law from our Congressional*
*leaders.*
*But really nothing has changed in all these*
*years*
*Despite federal laws and these plaintiffs'*
*fears.*

*Both salamander and swimmer enjoy the*
*springs that are cool,*
*And cleaning is necessary for both species in*
*the pool.*
*The City is doing its best with full federal*
*support,*
*So no temporary injunction shall issue from*
*this Court.*

*Therefore, today, Austin's citizens get away*
*with a rhyme;*
*But, the truth is, they might not be so lucky*
*the next time.*
*The Endangered Species Act in its extreme*
*makes no sense.*
*Only Congress can change it to make this*
*problem past tense.*

BE IT REMEMBERED that on the 3rd day of June 1998, the Court held a hearing on the plaintiffs' motions for preliminary injunctions in the above-styled case.[1] All parties appeared by representation of counsel. The Court heard testimony, received exhibits in evidence, and considered the arguments of the parties. Following the hearing, the Court received the City's Memorandum in

---

1. Specifically, the motions before the Court were the plaintiffs' Amended Motion for Preliminary Injunction Against Defendant United States Fish and Wildlife Service [# 12] and Amended Motion for Preliminary Injunction Against Defendant City of Austin [# 13]. The plaintiffs previously filed a Motion for Preliminary Injunction Against Defendant United States Fish and Wildlife Service and Request for Expedited Hearing [# 2] and a Motion for Preliminary Injunction Against Defendant City of Austin and Request for Expedited Hearing [# 3].

Opposition to Plaintiffs' Application/Motion for Preliminary Injunction [# 23] and the plaintiffs' reply thereto. The Court also received a Motion to Intervene [# 21] from the Save Our Springs Alliance, Inc. ("SOS"). The Court denied the Motion to Intervene but allowed SOS to proceed as *amicus curiae* and will consider the Brief of Amicus Curiae/Intervenor–Applicant Save Our Springs Alliance, Inc. in Opposition to Application for Preliminary Injunction [# 27]. After consideration of the evidence, the arguments, the briefs, and the applicable law, the Court enters the following memorandum opinion and orders.

On January 20, 1998, the plaintiffs in this case filed a notice of intent to sue for failure to protect the Barton Springs Salamander.[2] On May 22, 1998, the plaintiffs filed suit in this case under the civil enforcement provisions of the Endangered Species Act, 16 U.S.C. § 1540(g), seeking injunctive and declaratory relief as well as preliminary injunctions. In its motions for preliminary injunctions, the plaintiffs seek to enjoin pool cleaning and experimentation activities in Barton Springs Pool and to suspend two scientific permits issued by the Fish and Wildlife Service ("FWS").

## I. Background: The Endangered Species Act and the Barton Springs Salamander

The primary statute at issue in this case is the Endangered Species Act of 1973 ("ESA"). 16 U.S.C. §§ 1531–1544. The stated purposes of the ESA are

to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section.

*Id.* § 1531(b). The Supreme Court has described the ESA as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."

*Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 2294, 57 L.Ed.2d 117 (1978) ("*TVA* ").

According to section 9 of the ESA, "[e]xcept as provided in sections 1535(g)(2) and 1539 of this title, with respect to any endangered species of fish or wildlife listed pursuant to section 1533 of this title it is unlawful for any person subject to the jurisdiction of the United States to … take any such species within the United States or the territorial sea of the United States." 16 U.S.C. § 1538(a)(1)(B). "Take" is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). "Harm" is any "act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation when it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering." 50 C.F.R. § 17.3. "Harass" means "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." *Id.* The Supreme Court has interpreted the ESA and its regulations broadly, making the ESA extremely protective of endangered species. For example, the Fish and Wildlife Service's ("FWS") broad definition of "harm" was upheld in *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon* based on the language of the statute and the broad purpose of the ESA. *Babbitt,* 515 U.S. 687, 115 S.Ct. 2407, 2412–13, 132 L.Ed.2d 597 (1995).

Years earlier, the Supreme Court held that the ESA was to be construed literally and applied harshly when its language so dictated. In *TVA v. Hill,* the TVA had spent $78 million on the Tellico Dam, which was eighty percent finished. *TVA,* 98 S.Ct. at 2288. However, it was discovered that the snail darter, a species of small fish which lived in the river and had recently been placed on the

---

**2.** This was well in advance of the 60–day notice requirements for a citizen suit. 16 U.S.C.

§ 1540(2)(A).

Endangered Species list, would be rendered extinct by the completion of the dam because "[t]he proposed impoundment of water behind the proposed Tellico Dam would result in total destruction of the snail darter's habitat." *Id.* at 2285–86 (citation and emphasis omitted). Because the Court found Congress to have valued the survival of species as "incalculable," it upheld the injunction of the completion of the dam, despite the huge economic costs and the loss of electricity and irrigation to thousands of citizens.

To soften the harshness of the ESA under *Hill,* Congress amended the ESA in 1982 to allow individuals to acquire permits to "take" certain endangered species, as long as those "takes" do not endanger the survival of the species and various requirements are met. These two types of permits, the 10(a)(1)(A) permit ("Scientific Permit") and the 10(a)(1)(B) permit ("Incidental Take Permit") are at issue in this case, and the statutory authority for them states:

> [10(a) . . .] (1) The Secretary may permit, under such terms and conditions as he shall prescribe—
>
> (A) any act otherwise prohibited by section 1538 of this title for scientific purposes or to enhance the propagation or survival of the affected species, including, but not limited to, acts necessary for the establishment and maintenance of experimental populations pursuant to subsection (j) of this section; or
>
> (B) any taking otherwise prohibited by section 1538(a)(1)(B) of this title if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity.

ESA, § 10, *codified at* 16 U.S.C. § 1539(a)(1).

The Barton Springs salamander (the "Salamander") is a particular species of a genus of salamanders that are found in great numbers throughout the state of Texas. The Salamander, however, lives only in Zilker Park in Austin, Texas—specifically, in certain springs in Barton Creek. The Salamander is a totally aquatic and neotenic amphibian, which means it lives its entire life in water and breathes through gills. It grows to approximately three inches in length and lives in rocks and gravel at the bottom of certain springs. The distinguishing features of the Salamander are that it has smaller eyes, a slightly different musculoskeletal system, and different genetic structures than other more populous species of salamanders in Texas. The presence of the Salamander was first documented in Barton Springs in 1946, and the Salamander was listed officially as a species in 1993 and given the scientific name *eurycea sosorum.*[3] On May 30, 1997, the Salamander was placed on the Endangered Species list and thereby given the full protection of the ESA. *See* 62 Fed.Reg. 23,-377 (1997).

The habitat of the Salamander, Zilker Park, is the premier public park owned and operated by the City of Austin. Zilker Park is located within a mile of downtown Austin and contains a nature center, botanical gardens, a hillside theater, hike-and-bike trails, several playgrounds, soccer fields, softball fields, beach volleyball courts, picnic areas, open grassy areas where kite-flying is common, Barton Creek, and Barton Springs Pool. Barton Springs Pool is not an ordinary pool. It is not an artificially bounded, chlorine-sanitized, utility-water-filled, mechanically filtered, swimming pool. Instead, this unique swimming hole was created in the late 1920s when a small dam was built across Barton Creek to hold back the cool, pristine water that flows naturally from the main outlet of the underground Barton Springs. Salamander populations are known to live in Barton Springs Pool and in three other spring outlets: Eliza Springs, Upper Barton Spring, and Sunken Garden Springs.

When FWS listed the Salamander as an endangered species, it stated that "[t]he primary threats to this species are degradation of the quality and quantity of water that feeds Barton Springs due to urban expansion over the Barton Springs watershed. Also of concern is disturbance to the salamander's surface habitat in the pools where it occurs." *Id.* This lawsuit does not address the "pri-

---

3. *"Eurycea"* is the name of the genus containing many species of salamanders, and *"sosorum"* is the specific name for the species of the Barton Springs Salamander. The root of *"sosorum"* comes from "SOS," the acronym for the Save Our Springs ordinance, a 1992 ordinance passed by the citizens of Austin to protect the aquifer that supports Barton Springs.

mary threats" to the Salamander, but instead focuses on the concern based on the disturbance to the pools where the Salamander lives.

## II. Findings of Fact

The Court makes its findings of fact based on the evidence presented at the preliminary injunction hearing held June 3, 1998. Numerous documentary exhibits were admitted in evidence, and the Court considers them in its decision. The two witnesses who gave testimony at the hearing were both scientists who are experts on the Salamander and intimately involved with the pool-cleaning experiments at issue in this case. Matthew Lechner is an aquatic biologist with FWS who acts as a technical advisor on ESA section 10(a)(1) permits. Robert Hansen is an Endangered Species Biologist for the Watershed Protection Department of Austin.

The City is in the process of applying for a section 10(a)(1)(B), 16 U.S.C. § 1639(a)(1)(B), permit ("Incidental Take Permit") and has been cooperating with FWS longer than the Salamander has even been considered an endangered species. Under the requested Incidental Take Permit, the City would conduct pool cleaning activities in Barton Springs Pool. Namely, the City seeks to lower the water level in the pool, spray high-pressure water in certain areas to clean the pool, drive small motor vehicles called "Bobcats" in the shallow portion of the pool to clean it, and use wire brushes to clean the shallow end of the pool. Of course, the City also intends to allow swimming in the pool under the permit. It is expected that the Incidental Take Permit will make its way through the process and be issued in August or September 1998.[4] The City has been conducting pool cleaning and experimentation under a section 10(a)(1)(A), 16 U.S.C. § 1639(a)(1)(A), permit ("Scientific Permit") issued by FWS.[5]

When the pool is cleaned, the following general process occurs: The water is lowered by releasing it from the dam. High-pressure water and scrub brushes attached to small motor vehicles called "Bobcats" are used to clean silt and algae from the shallow areas of the pool. After cleaning, the dam is closed again and the water emanating from the springs refills the pool.

There is some impact on the Salamanders when the pool is cleaned. When the water level is lowered, Salamanders located in rocks or fissures in shallow water may get stuck. The evidence adduced during the hearing was that keeping a Salamander out of water is analogous to holding an attorney's head under water—neither organism can breathe. Salamanders apparently have

---

4. Some of the detailed procedural requirements of an Incidental Take Permit are described in section 10 of the ESA:

> (2)(A) No permit may be issued by the Secretary authorizing any taking referred to in paragraph (1)(B) unless the applicant therefor submits to the Secretary a conservation plan that specifies—
> (i) the impact which will likely result from such taking;
> (ii) what steps the applicant will take to minimize and mitigate such impacts, and the funding that will be available to implement such steps;
> (iii) what alternative actions to such taking the applicant considered and the reasons why such alternatives are not being utilized; and
> (iv) such other measures that the Secretary may require as being necessary or appropriate for purposes of the plan.
> (B) If the Secretary finds, after opportunity for public comment, with respect to a permit application and the related conservation plan that—
> (i) the taking will be incidental;

> (ii) the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking;
> (iii) the applicant will ensure that adequate funding for the plan will be provided;
> (iv) the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild; and
> (v) the measures, if any, required under subparagraph (A)(iv) will be met;
> and he has received such other assurances as he may require that the plan will be implemented, the Secretary shall issue the permit. The permit shall contain such terms and conditions as the Secretary deems necessary or appropriate to carry out the purposes of this paragraph, including, but not limited to, such reporting requirements as the Secretary deems necessary for determining whether such terms and conditions are being complied with.

16 U.S.C. § 1539(a)(2).

5. The specific Scientific Permits issued by FWS to the City are Permit PRT–676811 and Permit PRT–833851. For simplicity's sake, the two permits are referred to collectively as the "Scientific Permit."

brains that are too small to tell them the simple survival message: "Stay in the water or you can't breathe."[6] Because of this problem, three or more human individuals monitor the areas from which the water recedes during pool cleaning to search for stranded Salamanders. If a stranded Salamander is found, it is picked up with a leaf or twig and placed in a cup with pool water and then taken to deeper water, where it will be undisturbed during the rest of the cleaning.[7] Salamanders may also be picked up with nets, but they are never touched by human hands, which contain bacteria that have been found to be harmful to the Salamander.

The Court finds that no other part of the cleanup process affects the Salamanders. The chlorine level in the municipal water supply used to spray certain areas of the pool outside the Salamander habitat is so low that it drops to a scientifically inconsequential level by the time it hits the pool water. The high-pressure streams are used to clean silt only outside the Salamander habitat. Algae, which provides potential food sources for the Salamanders, is only removed from places where it causes anoxic[8] conditions that are detrimental to the Salamanders or causes slippery surface or murky water that could endanger swimmers; and it is never removed to any extent that would biologically impact the Salamanders' food sources.[9] The Bobcats and wire brushes are not used anywhere near the Salamanders' habitat.

6. Of course, the Salamanders are the ones who live in beautiful Barton Springs care free, with millions of dollars and thousands of people scrambling to assist in their stress-free living and procreation. On the other hand, the Congress passed a law that blocked the completion of a $100 million dam and wasted $78 million of taxpayers' money for a 3–inch species of perch. Therefore, it is not clear who has the smaller brains.

7. Lechner testified that when the Salamanders are released in deeper water, they swim away and "seem happy."

8. "Anoxic" means devoid of oxygen.

9. On one occasion, a City employee mistakenly began cleaning algae off of a pool wall inappropriately, but the employee was quickly corrected and halted before completing the job.

The undisputed evidence proved that much more severe and less environmentally sensitive means of cleaning the pool were used for many years during the existence of the Salamander in Barton Springs Pool.[10] The cleaning regimen under the Scientific Permit has allowed the City and FWS to learn the impact of cleaning on the Salamanders. The results of these studies show that none of the activities other than changing the level of the pool have any impact on the Salamanders. More importantly, the research under the Scientific Permit has allowed the scientists, under the direct supervision of and cooperation with the federal government, to improve the cleaning procedures to become more Salamander-friendly. For instance, the original protocol was to let each of the restraining walls open one at a time, in order to let the water down gradually and allow the Salamanders more time to get to water instead of remaining stranded. However, from their experiments, the scientists determined it is better to open all four restraining walls at once and find and move any stranded Salamanders at that time.

Aside from improved methods, the cleaning under the Scientific Permit led to the discovery that many Salamanders were living in the "beach" area of the pool, which was left exposed when water was drawn down. This information led to more careful efforts to find Salamanders on the beach during cleaning. More importantly, it led to the decision to replace the beach with new rocks

Nevertheless, the Court finds from the evidence that none of the City's cleaning of algae has any biologically significant impact on the Salamanders' food sources. The uncontroverted scientific evidence made it clear there is an abundance of algae and other food sources in the Salamanders' habitat. In other words, it is obvious that the Salamanders never missed a meal because of the City's algae removal during pool cleaning.

10. For instance, in the past, the City used chlorine and copper sulfate, "fairly harsh chemicals" according to one expert, to clean the pool. The City previously used high-pressure water to clean fissures, a Salamander habitat, and no longer does. Similarly, the City previously used harsh metal scrapers on the pool as opposed to the brushes currently used. Finally, the City currently uses triple silt fences to guard against silt getting into Salamander habitat, whereas it used only one or none in the past.

and gravel, since the old beach was laden with silt, algae and hardened rock, which created anoxic pockets where the Salamander could not live. The uncleaned beach area was an inhospitable habitat for the Salamanders and increased their likelihood of being stranded during pool cleaning. After the new beach was completed on April 16, 1998, scientists found no stranded Salamanders during beach cleaning experiments.[11] When the water was at normal levels, however, an informal SCUBA survey by one of the scientists showed that Salamanders were indeed living in the beach area. This led to the undisputed conclusion of the scientific expert testimony that the Salamanders are living on the new beach but are now able to move to deeper water when the water level is lowered for cleaning.[12] Additionally, this new finding has led to the practice of roping off the beach and other areas to prevent swimmers or waders from disturbing Salamander habitat.

Despite these scientific determinations and changes in cleaning procedures and swimming rules for the benefit of the Salamander, the undisputed evidence is that more research is needed before an intelligent completion of the Incidental Take Permit process should be completed. For example, the scientists have only seven data points for discovering how many Salamanders are stranded during the cleaning pro-

cess, and the numbers range widely from 1 to 36. Furthermore, only four of those data points come following the beach restoration. Therefore, there is no reliable data of how many "incidental takes" will occur during the final pool cleaning procedures. Additionally, the scientists need more detailed information on the long-term effects of Salamanders being stranded and moved when the pool is lowered for cleaning. All they know now is that the Salamanders seem unharmed and are even described as "happy" when they are released into deeper water after being stranded. They would like to know what long-term effects being stranded during drawdowns may have on the Salamanders' mortality, reproductivity, or other factors. This is more information that may be crucial to the determination of the extent of the "incidental takes" to be permitted under the Incidental Take Permit during pool cleaning operations.

In summary, the Court finds no evidence that continued pool cleanings by the City of Austin, under the Scientific Permits and supervised by FWS, could possibly cause the extinction of the Salamanders.[13] Instead, while the activities during pool cleaning experimentation may occasionally annoy, stress, or otherwise "take" individual Salamanders, the community of Salamanders is better off because of the experimentation and

11. The beach was replaced April 14–16, 1998. The water was lowered April 14. Then, four to eight inches of silt, algae, and sediment were removed off the top of the old beach by Bobcats, and the beach was re-covered with a layer of "new" sediment. The evidence is clear that the "new beach" was a much better Salamander habitat.

12. Despite the undisputed benefits to the Salamander of the beach restoration, the plaintiffs argue the restoration was done without the authority of any permit. This issue itself is clearly moot because it is finished and not expected to be re-done any time soon. However, the plaintiffs appear to offer it as evidence of the lawlessness of the City's and FWS's actions. No evidence showed any "take" that occurred during the beach restoration that would not have occurred in any normal cleaning. The water was drawn down for a longer time period, but the Salamanders were removed once, just as they would have been for any routine cleaning clearly authorized by the Scientific Permit. Moreover, Robert Hansen's personal permit under Scientific Permit PRT–833851 gave him the authority to "maintain and restore salamander habitat as

deemed necessary and as approved by the Austin Ecological Services Field Officer." Plaintiffs' Exhibit 2, at 3. Assuming Matthew Lechner (or whoever the Austin Ecological Services Field Officer of FWS was) approved the restoration (and there is no evidence anyone at FWS disapproved it), the beach restoration complied not only with the spirit but with the letter of the Scientific Permit and the ESA. In short, the Court concludes, based on all the facts in evidence, that the plaintiffs' laborious and lengthy attack on the beach restoration was not only irrelevant but unsuccessful.

13. The recently filed affidavits of the plaintiffs do not affect this finding in any way. The scientific evidence showed that even if pool cleaning could cause a limited fluctuation in the number of Salamanders, that would not cause any concern for extinction. Because of the Salamanders' limited habitat near the outlets of the springs, the major threats of extinction arise from the possibility of the pollution of the groundwater, whether by overdevelopment or a catastrophic spill.

its fruits. The continued survival of the species as a whole is thereby enhanced.

## III. Conclusions of Law

■ The standard criteria for a preliminary injunction is that a plaintiff must demonstrate the following elements for relief: (a) a substantial likelihood of success on the merits, (b) a substantial threat of irreparable injury to the plaintiff if the injunction is not granted, (c) the balance of hardships in favor of the plaintiff and not the defendant, and (d) the absence of a disservice to the public interest if the injunction is granted. *DSC Communications Corp. v. DGI Techs., Inc.,* 81 F.3d 597, 600 (5th Cir.1996). The plaintiffs argue that these criteria do not apply, however, in this case.

The plaintiffs rely on a Ninth Circuit case for their argument. *See Sierra Club v. Marsh,* 816 F.2d 1376 (9th Cir.1987). The Court refuses to follow the plaintiffs' suggested standard for three reasons. First, the Ninth Circuit applies different criteria to motions for preliminary injunctions than the Fifth Circuit. *Compare Marbled Murrelet v. Babbitt,* 83 F.3d 1068, 1073 (9th Cir.1996) ("In this circuit, the test for granting a preliminary injunction is whether a party has demonstrated: (1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation, and the balance of hardships tips sharply in favor of the party seeking relief.") (citing *Marsh,* 816 F.2d at 1382) *with DSC Communications Corp.,* 81 F.3d at 600 and *Rodriguez v. United States,* 66 F.3d 95, 97 (5th Cir.1995) (both applying the same four-element standard to a preliminary injunction). Second, even the key language the plaintiffs cite from *Marsh* as favorable to their argument shows that *Marsh* is inapplicable to this case: "In Congress's view, projects that jeopardized the *continued existence* of endangered species threatened incalculable harm.... The act does not permit courts to consider the hardship an in-

junction may impose on the project if endangered species' *habitat is likely to be destroyed.*" *Marsh,* 816 F.2d at 1383, 1387 (emphasis added). There was simply no evidence offered at the hearing suggesting this is a case where the "continued existence" of the Salamander or the destruction of its habitat is at issue. Third, the plaintiffs' argument over the standard is irrelevant based on the facts of this case because the Court finds the first two elements of the Fifth Circuit four-part test, likelihood of success on the merits and irreparability of harm, require denial of the motion for temporary injunction, as discussed below.[14]

## A. No Substantial Likelihood of Success on Merits

The City of Austin was granted a Scientific Permit for its operations in the pool and corresponding permits for its biologists under the supervision of and with directions from the biologists of the FWS. The goal of the Scientific Permit was to determine the impact on the Salamander of the most careful and wise cleaning methods for the pool (methods much less harsh than historic practices used for over fifty years). The federal authorities allege the City is operating legally under the proper permit and the plaintiffs allege the operations of the City are per se illegal.

■ In analyzing whether FWS, a federal agency, has properly given permits to the City of Austin under the Endangered Species Act and regulations promulgated pursuant to it, this Court employ the analysis set forth in *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under *Chevron's* two-part analysis, the Court first looks to see if the plain language of the statute expresses Congress' clear and unambiguous intent on the specific question. *Id.* at 2781; *Reich v. Arcadian Corp.,* 110 F.3d 1192, 1195 (5th Cir.1997). If the statute is either silent or ambiguous on the precise

14. Furthermore, the Court is willing to assume from the congressional intent of the ESA and the Supreme Court's holding in *TVA* that the public interest in protecting endangered species is high and that a high detriment to the defendants is not enough to prevent an injunction that would

save a species. The facts of this case, however, make it clear that imminent extinction cannot possibly result from the pool cleaning operations under the Scientific Permit and under the close scrutiny of the federal government.

point in issue, then the question for the Court is "whether the agency's answer is based upon a permissible construction of the statute." *Chevron,* 104 S.Ct. at 2781–83; *Reich,* 110 F.3d at 1195. In determining whether the agency's construction of the statute that is ambiguous or silent on the issue is permissible, the Court should afford substantial deference to the interpretation of the agency charged with administering it. *Rust v. Sullivan,* 500 U.S. 173, 111 S.Ct. 1759, 1767, 114 L.Ed.2d 233 (1991).

An agency's construction of its own regulations is also entitled to a large amount of deference. The reviewing court must defer to the agency's interpretation unless an "alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation." *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 114 S.Ct. 2381, 2386–87, 129 L.Ed.2d 405 (1994) (citing *Gardebring v. Jenkins,* 485 U.S. 415, 108 S.Ct. 1306, 1314, 99 L.Ed.2d 515 (1988)). The agency action will only be set aside as arbitrary, capricious, or an abuse of discretion if it is "plainly erroneous or inconsistent with the regulation." *Id.* at 2386.

According to section 10 of the ESA,

The Secretary may permit, under such terms and conditions as he shall prescribe—

(A) any act otherwise prohibited by section 1538 of this title for scientific purposes or to enhance the propagation or survival of the affected species, including, but not limited to, acts necessary for the establishment and maintenance of experimental populations pursuant to subsection (j) of this section.

16 U.S.C. § 1539(a)(1)(A). According to this clear statutory language, a permit may be given to "take" an endangered species for scientific purposes. The evidence shows convincingly that the experimental pool cleaning was done for scientific purposes, and many scientific goals were in fact achieved, as described above. Furthermore, the uncontroverted evidence is that more scientific purposes remain to be served by continued pool cleaning experimentation. Therefore, the plaintiffs' challenge therefore fails on step one of the *Chevron* analysis because the agency's action is permitted by the plain language of the statute. The remaining question is therefore whether the FWS's decision to grant permission for the pool cleaning experimentation is "plainly erroneous or inconsistent" with its regulations.

The plaintiffs argue an Incidental Take Permit is necessary for the City's pool cleaning experimentation, and a Scientific Permit is inappropriate. Arguably, the pool cleaning activities are "incidental takes" because the purpose of the pool cleaning activities is not to "take" Salamanders. However, the pool cleaning activities are also for "scientific purposes," and nothing says a Scientific Permit covers only "non-incidental takes." Instead, Scientific Permits cover "takes" generally, while Incidental Take Permits only cover the subset of "takes" referred to as "incidental takes." Although Scientific Permits may often involve "non-incidental takes" and Incidental Take Permits involve only "incidental takes," the plaintiffs have wholly failed to persuade the Court that anything in the statutory or regulatory scheme mandates that Scientific Permits cannot allow "incidental takes."

There are, however, requirements that must be met for a Scientific Permit to be granted. For example,

[t]he Secretary may grant exceptions under subsections (a)(1)(A) and (b) of this section only if he finds and publishes his finding in the Federal Register that (1) such exceptions were applied for in good faith, (2) if granted and exercised will not operate to the disadvantage of such endangered species, and (3) will be consistent with the purposes and policy set forth in section 1531 of this title.

16 U.S.C. § 1539(d). Additionally, the Secretary must consider "the probable direct and indirect effect which issuing the permit would have on the wild populations of the wildlife sought to be covered by the permit." 50 C.F.R. § 17.22(a)(2)(ii). At this stage in the litigation, it is not clear whether FWS has complied with all its statutory and regulatory requirements in issuing the Scientific Permits and overseeing the pool cleaning activities. Nevertheless, the plaintiffs' likelihood of success on the merits, based on their

shotgun approach of attacking any and all activities of FWS, is not great enough to support the granting of a preliminary injunction.

One of the purposes of the experimental cleaning operations is to determine the scope of an Incidental Take Permit for the pool cleaning operations. The federal authorities must have sufficient information to issue the appropriate authority for the City to follow. The plaintiffs' position would require the City to acquire an Incidental Take Permit based on information that the undisputed testimony before the Court shows is insufficient to make a reliable scientific decision. Notwithstanding the evidence of "happy" and/or "stressed" Salamanders, the central fact remains that the federal and municipal authorities are attempting, scientifically, to ascertain how to maintain the habitat of the Salamanders by appropriate cleaning of the pool area. This is, of course, consistent with the interests of swimmers. Both can enjoy the water area in which both have coexisted for all these years.

█ Finally, it is clear the plaintiffs' claim under the National Environmental Protection Act ("NEPA") that the FWS failed to complete an environmental impact statement ("EIS") or environmental assessment ("EA") before granting the Scientific Permits fails miserably under the facts of this case. The FWS's permit actions are categorically excluded from the requirement of an EIS or EA that applies to many major federal actions. Specifically, a categorical exclusion applies to "[t]he issuance, denial, suspension, and revocation of permits for activities involving fish, wildlife, or plants regulated under 50 C.F.R., Chapter 1, Subsection B, when such permits cause no or negligible environmental disturbance." National Environmental Policy Act Revised Implementing Procedures, 62 Fed.Reg. 2375, 2381 (1997). Based on the evidence, the Court concludes the activities under the Scientific Permit in fact caused "no or negligible environmental disturbance," and the FWS was certainly not acting "arbitrarily or capriciously" in coming to that conclusion. Therefore, the FWS was categorically excluded from the EIS and EA requirements, and no further analysis is required on that issue.

**B. No Threat of Irreparable Harm Caused by Defendants' Activities**

The plaintiffs rest much of their argument that a preliminary injunction must be granted on the Supreme Court's harsh results in the *TVA* case. It is important to note, however, that the *TVA* decision was based on "the premise that operation of the Tellico Dam w[ould] either eradicate the known population of snail darters or destroy their critical habitat." *TVA*, 98 S.Ct. at 2290. The uncontroverted evidence in the case before the Court is that continued cleaning operations in the Barton Springs Pool will not destroy the Salamanders' habitat or eradicate their population. On the contrary, the evidence showed that the activities conducted thus far under the scientific permit have actually improved the Salamanders' habitat overall and produced a net positive effect on the Salamanders' population. Therefore, the facts of the case before the Court are strikingly different from those before the Supreme Court in *TVA*.

█ There is no evidence presented in this case that any individual Salamander has been killed or maimed by the pool cleaning activities under the Scientific Permit. The plaintiffs allege the "stranded" Salamanders were placed under "stress," and this constitutes an illegal "take" under the law. If the Salamanders are "taken," however, such takes are permitted under the ESA because of the City's Scientific Permit. In fact, the uncontroverted evidence is that the pool cleanings under the Scientific Permit are helpful to the Salamander species as a whole and bring no risk of extinction whatsoever. The evidence further proves that, absent appropriate cleaning, the Salamanders could be substantially harmed. Finally, the evidence shows more Salamanders have been counted since the experimental cleaning periods commenced. In short, there is no evidence that the failure to enjoin the cleaning activities under the Scientific Permit will cause the Salamanders irreparable harm. On the contrary, enjoining the pool cleaning activities could cause the Salamanders substantial harm.

## C. Equity Issues

 Because the Court does not find a substantial likelihood that the plaintiffs will succeed on the merits and no evidence whatsoever of irreparable harm, no preliminary injunction will be granted. It is worth noting that the harm to the defendants and the public interest also weigh heavily against granting the injunction. Significantly, the Court finds the experimental pool cleanings advance the public interest of benefitting the Salamander. Ironically, if the plaintiffs were granted their injunction for the purported purpose of protecting the Salamander, they would not only fail to benefit *eurycea sosorum,* but they would also frustrate the public interest by causing harm to a different species, *homo sapiens.*

Pool cleaning is essential to the safety of the pool. If the pool bottom in shallow areas is covered with silt and algae, people could easily slip, fall, and injure themselves. If the shallow end of the pool is dangerous, it could need to be closed, and swimmers would be crowded into the deep end. The buildup of murk and algae in the deep end would make it more difficult for lifeguards to see swimmers who needed assistance. It would be quite a tragedy if a swimmer drowned or was injured because the pool could not be cleaned due to the "stress" caused to Salamanders by moving them during cleaning.

Therefore, it is likely that it would be necessary for the City to close Barton Springs Pool for some or all of the summer months if cleaning were enjoined. This would of course cause a deprivation to the thousands of swimmers who enjoy the cool springs in Austin's warm summers—especially if this summer continues to produce record-setting temperatures as it has thus far. Moreover, the City and its taxpayers would lose a large amount of revenue. The pool produced revenue of over $70,000 in May 1998 and is projected to produce $430,000 in the 1997–98 fiscal year.

It is important to stress that if the pool cleaning activities were likely to cause the extinction of the Salamander, all these costs to Austin and its citizens would be irrelevant under the Endangered Species Act and *Hill.* But under the facts of this case, that drastic measure is not necessary. The merits of the case, the lack of irreparable harm, and the equities of the case all indicate that the plaintiffs' motions for preliminary injunctions should be denied.

## IV. Conclusion

This Court is not convinced by a preponderance of the evidence that the plaintiffs will prevail in this case. Further, in balancing the public's interest under the circumstances of this particular case, the Court believes the continuing scientific operations are a benefit to the Salamander as well as to the many thousands of swimmers who have, and hopefully will continue, to enjoy Barton Springs Pool, that wonderful creation of God's handiwork.

In accordance with the foregoing, the Court enters the following orders:

IT IS ORDERED that the plaintiffs' Amended Motion for Preliminary Injunction Against Defendant United States Fish and Wildlife Service [# 12] is DENIED; and

IT IS FURTHER ORDERED that an Amended Motion for Preliminary Injunction Against Defendant City of Austin [# 13] is DENIED.