**Allen LEE, Diana Lee, Plaintiffs,**

v.

**COMMISSIONERS' COURT OF JEFFERSON COUNTY, TEXAS, Defendant.**

**No. C.A. 1:00–CV–48.**

United States District Court,
E.D. Texas,
Beaumont Division.

Jan. 28, 2000.

the bankruptcy rules were met. *See* F.R. Bankruptcy P. 9027.

Allen Lee, Beaumont, TX, plaintiff pro se.

J. Thad Heartfield, Patrick Connell McGinnis, Heartfield & McGinnis, Beaumont, TX, for defendant.

### MEMORANDUM OPINION

JOE J. FISHER, District Judge.

On January 27, 2000, this Court entered an "Order Denying Plaintiffs' Application for Preliminary and Permanent Injunction." The Court enters this Memorandum Opinion in support of the denial. The original Order of January 27, 2000 shall remain in effect.

### I. STATEMENT OF FACTS

#### A. *Background On The Entertainment Complex*

On June 22, 1999, plans for the Jefferson County (Texas) Entertainment Complex were presented to the community during a public gathering at the proposed site. Jefferson County ("County") officials explained that the Entertainment Complex would be used for a variety of entertainment purposes and that the cost of the project would be approximately $50,000,-000. County officials said the funds would be raised through a variety of public and private sources.

Over the next six months, County officials considered the financing options that would be most beneficial to the County. Ultimately, on January 10, 2000, the Jefferson County Commissioners met and voted in a public forum to approve $55,-000,000 in certificates of obligation to finance the complex. In connection therewith, the County set the date of January 31, 2000, as the date it would take formal action to authorize the issuance and sale of the certificates.

#### B. *Summary Of The Certificates Of Obligation*

As mentioned above, to finance the construction of the Entertainment Complex, the County intends to issue $55,000,000 in certificates of obligation pursuant to the Texas *Certificate of Obligation Act, Section 271.041 et seq., Texas Local Government Code Annotated.*

That Act was adopted by the Texas Legislature in 1971 to provide an alternate procedure for cities and counties to finance public works and related projects. *See Section 271.042(a), Texas Local Government Code Annotated.* Prior to issuing certificates of obligation, an issuer is required to publish notice of its intent to do so at least 14 days prior to the date the issuer passes an order to authorize the issuance of the certificates of obligation. *Section 271.049, Texas Local Government Code Annotated.* If prior to issuing the certificates of obligation the issuer receives a petition signed by at least five percent of the registered voters, then the issuer must first order and hold an election and obtain approval of the issuance of the certificates of obligation from the registered voters. *Id.* However, if no such petition is filed with the issuer, then the issuer is authorized to issue the certificates of obligation without conducting an·election.

Pursuant to the above Act, the County has already taken substantial action towards the issuance of the certificates of obligation. The County intends to enter into an underwriting contract with Dain Rauscher Incorporated, an investment firm and securities dealer, who will purchase the certificates of obligation from the County and resell the Certificates to the public. In compliance with Texas law, the County has published notice of its intent to issue the certificates of obligation in the *Beaumont Enterprise* (a local newspaper of general circulation in Jefferson County). Such notice was published on each of the following dates: December 21, 1999; December 28, 1999; January 4, 2000; January 11, 2000 and January 18, 2000. *See* Exhibit F. The County and its financial advisor, Coastal Securities, have also prepared a Preliminary Official State-

ment dated January 19, 2000 that has been distributed on behalf of the County by Coastal Securities to various underwriters in the process of getting ready to sell the certificates of obligation. *See* page 1 of the Preliminary Official Statement marked as Exhibit G. As set out in the notice published in the *Beaumont Enterprise* and in the Preliminary Official Statement, the County has set January 31, 2000 as the date it intends to pass an Order authorizing the issuance and sale of the certificates of obligation. The County also made a trip to New York in December, 1999, where it met with bond rating agencies to obtain a rating for the proposed certificates of obligation.

### C. *Summary of Arguments*

In their application for preliminary injunction, Plaintiffs argue that Texas Local Government Code § 271.049 and Texas Election Code § 277.002 are in conflict and that the Texas Local Government Code § 271.049 violates the First and Fourteenth Amendments to the United States Constitution. In support thereof, Plaintiffs incorrectly argue that § 271.049(a) limits protesters to 14 days to circulate a petition opposing issuance of Certificates of Obligation and that § 277.002(e) gives protesters a right to have at least 180 days to circulate their petition. However, Plaintiffs wholly fail to provide any legal or evidentiary authority for such propositions.

### II. *PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION*

■ In order to prevail in a preliminary injunction, the movant must demonstrate the following elements:

(1) Likelihood of success on the merits;

(2) The potential for irreparable injury to the plaintiff unless the court grants the injunction;

(3) A balancing of the relevant equities, most importantly the hardship to the defendant if the injunction is issued as con-

trasted with the hardship to the plaintiff if interim relief is denied; and

(4) The effect on the public interest of a grant or a denial of an injunction.

*See DSC Comm. Corp. v. DGI Tech., Inc.,* 81 F.3d 597, 600 (5th Cir.1996).

Plaintiffs have failed to establish the right to a preliminary injunction under the above factors. Accordingly, Plaintiffs' application should be denied in its entirety.

### A. **Plaintiffs Cannot Demonstrate A Reasonable Likelihood Of Success On The Merits.**

### (1) *No Conflict Between Election Code and Texas Local Government Code.*

■ Plaintiffs incorrectly interpret the Texas Certificate of Obligation Act of 1971 and the Texas Election Code. First, Plaintiffs incorrectly argue that § 271.049(c) of the Local Government Code limits protesters to only 14 days to circulate a petition to force an election on the issuance of certificates of obligation. However, the Texas Certificate of Obligation Act of 1971 references 14 days only with respect to the requirement that Jefferson County provide public notice prior to the issuance of the Certificates of Obligation. It does not limit the number of days petitioners have for circulating petitions in opposition to the issuance. Second, Plaintiffs incorrectly argue that the Texas Election Code § 277.002(e) entitles protesters to a full 180 days to circulate a petition to force an election on the issuance of certificates of obligation. However, Section 277.002(e) of the Election Code provides that any signatures obtained more than 180 days before the petition is filed are invalid. Texas Election Code § 277.002 is "simply applied to determine the validity of the signatures of such a petition." *Baugh v. Williams,* 762 S.W.2d 627, 630 (Tex.App.—Tyler 1988). It does not guarantee 180 days to circulate petitions. Nothing in the Election Code or the Government Code guar-

antees minimum time periods for collecting signatures on a petition.

Sections 271.049(a) and (c) provide for the appropriate notice publication deadlines prior to the issuance of certificates of obligation and the filing deadline for any petitions protesting the issuance of the certificates. Specifically, § 271.049(a) provides that:

... certificates may not be issued unless the issuer publishes notice of its intention to issue the certificates. The notice must be published once a week for two consecutive weeks in a newspaper ... with the date of the first publication to be before the 14th day before the date tentatively set for the passage of the order or ordinance authorizing the issuance of the certificates.

Subpart (c) provides that:

... if before the date tentatively set for the authorization of the issuance of the certificates or, if before the authorization, ... the County Clerk ... receives a petition signed by at least 5% of the qualified voters of the issuer protesting the issuance of the certificates, the issuer may not authorize the issuance of the certificates unless the issuance is approved at an election....

Nothing within this statute provides that protesters are limited to 14 days to circulate and submit their opposition to the issuance of certificates of obligation.

The Court notes that Plaintiffs do not, and have never, argued that Jefferson County has failed to follow any law of the State of Texas and, specifically, Plaintiffs have never stated nor argued that Jefferson County has failed to adhere to the Certificate of Obligation Act of 1971. Plaintiff's challenge goes far beyond the actions of Jefferson County, Texas. If successful, their challenge could substantially alter the powers provided to all Texas governmental entities that issue bonds and certificates of obligation. If the Court were to enjoin Jefferson County's issuance of these certificates of obligation, then ev-

ery time a governmental entity wanted to finance a public project through bonds or certificates, such financing would have to first be approved through the election process.

Plaintiffs have loosely and incorrectly argued conflicts between the Election Code and the Certificate of Obligation Act of 1971. This alleged conflict has already been discussed in the case of *Baugh v. Williams*, 762 S.W.2d 627 (Tex.App.—Tyler 1988). In *Baugh*, the Court found that there was no conflict between § 271.049 of the Local Government Code and § 277.002 of the Election Code. The Court held and stated as follows:

Traditional notions of statutory construction direct us to construe the statutes in such a manner as to give effect to each if at all possible [citations omitted]. That task presents no difficulty here. Local Government Code § 271.049(c) is fully effective to outline the procedure for authorization of issuance of certificates of authorization, including the percentage of qualified voters who must protest in order to mandate an election. Section 277.002 of the Election Code can also be given full effect when the petition for an election involved arises under Local Government Code procedure. It is simply applied to determine the validity of the signatures of such a petition. *There is no conflict between the statutes.*

See *Baugh v. Williams*, 762 S.W.2d at 629–630.

■ Plaintiffs argue that Texas Local Government Code § 271.049 is unconstitutional because it denies them "access to ballot." Plaintiffs cite no authority for this proposition. There is no federally protected constitutional right to petition for, have access to the ballot, and vote in a municipal initiative election. *Citizens' Right to Vote v. Morgan*, 916 F.Supp. 601, 608 (S.D.Miss.1996).

Contrary to Plaintiffs' assertions, the First and Fourteenth Amendments to the United States Constitution do not give Plaintiffs a right to have six months to gather signatures for a petition.

### 2. No Constitutional Right to an Election.

Further, Plaintiffs' constitutional claims fail. The essential premise asserted by the Plaintiffs in support of their request for injunctive relief is that the Texas Certificate of Obligation Act is unconstitutional because it fails to provide for a realistic time to obtain a petition calling for an election, thereby denying the voters the right to petition and ballot. On this basis, Plaintiffs assert that this violates the 1st and 14th amendment to the United States Constitution, as well as Article 1, Section 27 of the Texas Constitution.

However, as noted above in Section III. A., the "right to petition for, have access to the ballot for, and vote in a municipal initiative election, is a wholly State-created right and is not secured by the federal constitution." *See Citizens' Right to Vote v. Morgan*, 916 F.Supp. 601, 608 (S.D.Miss. 1996).

Further, both the Texas Supreme Court and the Fifth Circuit have recognized that there is no constitutional right to force an election and that the Texas Legislature has the power to authorize a governmental entity to issue bonds and other debt without first calling an election of the voters. For example, in *Lasater v. Lopez*, 110 Tex. 179, 217 S.W. 373 (1919), taxpayers filed suit against Duval County to have certain warrants issued by the County declared invalid because the County failed to obtain voter approval for the issuance of the warrants. The warrants were issued by the County to finance road construction and the warrants were payable over 16 years with interest. The Texas Supreme Court upheld the County's authority to issue the warrants without an election.

Similarly, in *Henderson County v. Allred*, 120 Tex. 483, 40 S.W.2d 17 (Tex.1931),

the Texas Supreme Court held that Henderson County was authorized to issue road construction bonds without having to obtain voter approval. The Supreme Court stated that "[t]here is no inhibition in the [State] Constitution to prevent the Legislature from empowering a county to issue its negotiable bonds without the vote of the people...." *Henderson County*, 120 Tex. at 489, 40 S.W.2d at 19.

Likewise, the Commission of Appeals of Texas held in the case of *Holman v. Broadway Improvement Co.*, 300 S.W. 15 (Tex. Comm'n App.1927), that Galveston County had the authority under Texas law to issue time warrants to finance improvements to a sea wall and to levy a tax in payment of the time warrants without having to obtain voter approval.

The United States Fifth Circuit Court of Appeals upheld the same principle in *Shelby County v. Provident Savings Bank & Trust Co.*, 54 F.2d 602 (5th Cir.1932). In that case, suit was filed against Shelby County contesting the validity of road construction bonds issued by the County without voter approval. The Fifth Circuit held that under applicable provisions of the Texas Constitution, including Article 8 Section 9 and Article 11 Section 2, the County had the authority to issue such bonds.

A good discussion and summary of a county's power to incur and issue debt is contained in Texas Attorney General Opinion No. JM–697 (May 14, 1987). In that opinion, the Texas Attorney General ruled that a county has the authority to enter into a lease-purchase agreement to finance the purchase of a county jail. In reaching this opinion, the Attorney General cited the *Lasater v. Lopez* case discussed above for the principle that a County has the implied authority to use its credit to finance a public work. Furthermore, the Attorney General quoted the decision reached by the Texas Supreme Court in *San Antonio River Authority v. Shepperd*, 157 Tex. 73, 299 S.W.2d 920 (Tex.1957),

wherein the Texas Supreme Court held as follows: "[I]n the absence of express declaration the Legislature is not to be credited with the purpose of forcing a bond issue upon the people of a county every time it is necessary for the county to create an interest bearing debt of deferred maturity. . . ." *San Antonio River Authority,* 157 Tex. at 79, 299 S.W.2d at 925.

Plaintiffs have failed to cite any authority in support of their argument that they have a constitutional right to an election before the County can issue the certificates of obligation. In light of the above cases, it is clear that no such right exists.

### B. Plaintiffs Will Not Suffer Irreparable Harm If The Court Denies Their Requested Injunction.

■ Plaintiffs have not offered any credible proof that they will suffer irreparable harm if the injunction is not issued. The argument made by Plaintiffs is that they are taxpayers of Jefferson County, Texas, and thus will suffer irreparable harm if burdened with the certificates of obligation debt if the injunction is not issued. This argument is not valid. Rather, the County now has the right to impose ad valorem taxes up to its constitutional limit of $ .80 per $100 of valuation. *See Texas Constitution Article 8, Section 9.* Such taxes may be imposed to finance the County's operations, including public works projects. The issuance of the certificates of obligation by the County will not change the County's ability to impose such taxes. Thus, the status quo to the Plaintiffs remain the same. The certificates of obligation are not creating a new County tax, but rather are simply a means of allowing the County to use its credit to borrow money to finance public works projects. The certificates of obligation remain payable from within the County's existing constitutional debt limit of $.80 per $100 valuation.

Further, the public was informed that the County desired to build the project as early as June 22, 1999. As early as September 5, 1999, the public was informed that the County intended to finance the project through "certificates of obligation." As early as December 11, 1999, the public was made aware of the exact specifics of the certificates of obligation the County intended to pursue. Therefore, had Plaintiffs been truly interested in forcing an election on the bond issue, they could have begun gathering signatures as early as September 5, 1999 and no later than December 11, 1999. Plaintiff had no less than 45 days, if not four months, to gather signatures for the petition. They were not limited to 14 days.

### C. The Balance Of The Hardships Weighs Heavily Against The Entry Of An Injunction.

■ If Plaintiffs' *request for an injunction* is granted, the County will not be permitted to proceed with issuing the certificates of obligation. As a result, construction of the project will be delayed, exposing the County to rising construction costs. More importantly, interest rates have steadily increased over the past twelve months and the Chairman of the Federal Reserve Board has hinted that the Federal Reserve Board might raise interest rates at the next Board meeting scheduled to take place in February 2000. *See* Declaration of Patrick Swain marked as Exhibit H. Such increase would cause the interest rate payable under the certificates of obligation to increase, thereby increasing the financing costs to the County and its taxpayers by hundreds of thousands of dollars. Moreover, all of the work and expense incurred by the County and its bond counsel, financial advisor and others assisting the County in the issuing of the certificates of obligation would be lost and subject to having to again be incurred, including without limitation, the time and expense incurred in traveling to New York to meet with bond rating agencies, publishing the notice of intent to issue the certificates of obligation and preparing and

distributing the Preliminary Official Statement.

Granting the injunction would also be adverse to the public interest because it would have the affect of invalidating, or at least questioning the validity of, the Texas Certificate of Obligation Act. That Act is commonly and routinely used by cities and counties to finance public works projects. For example, during the calendar year 1999 alone, locally the City of Beaumont, Texas, issued $20,000,000 in certificates of obligation to finance public improvement projects and Jefferson County, Texas issued $6,000,000 in certificates of obligation. Granting the injunction would call into question the validity of outstanding certificates of obligation and thus the ability of cities and counties to issue certificates of obligation would be impaired and they could be delayed in financing on-going projects. *See* Declaration of Patrick Swain marked as Exhibit H. Furthermore, the public's interest is already protected by the requirement that the Texas Attorney General approve of the certificates of obligation before they can be issued. *See Texas Local Government Code § 271.050(c).*

In addition to the foregoing, if the injunction is granted, the public interest of the citizens of Jefferson County, Texas will be adversely affected by the loss of the economic and other benefits this project is expected to provide. Specifically, this project will provide both construction jobs and permanent jobs and upon completion will attract tourists and visitors from the surrounding area and across the State, thereby increasing business of various local business owners and increasing sales tax and other revenues for the County. The project will also help promote growth in this area, which will contribute to an increase in property values and further contribute to the growth of the local economy.

On the other hand, Plaintiffs have not offered any credible proof that they will sustain any irreparable harm if the injunction is denied.

## D. An Injunction Will Be Adverse To The Public Interest.

The proposed Entertainment Complex will create an estimated 1,238 new jobs and bring more than $481 million into the area economy through salaries, additional property tax income and new sales tax revenue, much of it coming from nearly three million out-of-town visitors expected to visit during the next 10 years. If an injunction were to be granted, these benefits might be severely delayed and diminished. *See* Declaration of Patrick Swain marked as Exhibit H.

## III. *PLAINTIFFS ARE NOT ENTITLED TO A PERMANENT INJUNCTION*

Although Plaintiffs did not request a permanent injunction in their written pleadings, they occasionally made reference and requested a "permanent injunction" during the oral hearing. To avoid any confusion, this Court also denied the request for a permanent injunction in the Order dated January 27, 2000.

## *CONCLUSION*

For the foregoing reasons, Plaintiffs' application for a preliminary and permanent injunction is denied. Plaintiffs cannot meet the elements necessary for this Court to issue the requested injunctive relief.