**WEST ALABAMA QUALITY OF LIFE COALITION, Plaintiff,**

v.

**UNITED STATES FEDERAL HIGH-WAY ADMINISTRATION, et al., Defendant.**

**No. CIV.A. H–03–5591.**

United States District Court,
S.D. Texas,
Houston Division.

Feb. 9, 2004.

James B. Blackburn, Jr., Blackburn & Carter, Houston, TX, for Plaintiff—West Alabama Quality of Life Coalition.

Myesha Braden, U.S. Department of Justice, Environment & Natural, Resources Division, Washington, D.C., for Defendants—United States Federal Highway Administration, Curtis Dan Reagan, Mary E. Peters, United States Department of Transportation, and Norman Y. Mineta.

Jack Foster Gilbert, Office of the Attorney General, State of Texas, Austin, TX, for Defendants—Texas Transportation Commission and John W. Johnson.

## ORDER ON REQUEST FOR PRELIMINARY INJUNCTION

HITTNER, District Judge.

Pending before the Court is the Motion for Preliminary Injunction filed by Plaintiff West Alabama Quality of Life Coalition. After considering the motion, submissions, argument of counsel at a hearing on February 2 and 3, 2004, and applicable law, the Court determines that the motion should be denied.

### INTRODUCTION

West Alabama Quality of Life Coalition ("WALQ") is a Texas non-profit corporation currently involved in a project to protect neighborhoods from freeway traffic diversions in and around the Richmond/West Alabama Corridor. Defendants are various federal and state transportation officials and agencies, including the Federal Highway Administration ("FHWA") and the Texas Department of Transportation ("TxDOT"). Plaintiff filed the instant lawsuit against Defendants asserting violations of federal law and requesting the issuance of a preliminary injunction to halt the impending U.S. 59/Spur 527 construction project scheduled to begin on February 13, 2004 at 9:00 p.m. The purpose of a preliminary injunction is to prevent irreparable injury to the parties and "preserve the court's ability to render a meaningful decision on the merits." *Meis v. Sanitas Serv. Corp.*, 511 F.2d 655, 656 (5th Cir.1975).

### BACKGROUND REGARDING U.S. 59/SPUR 527 PROJECT

Since 1961, Spur 527 has provided access to and from Houston's central business district from U.S. 59, also known as the Southwest Freeway.[1] However, Spur

---

1. Approximately 84,000 vehicles per day cur-    rently use Spur 527.

527 is aged, shows signs of deterioration, requires extensive costly annual maintenance, and is not within current TxDOT design guidelines as it lacks the proper sized shoulders in its travel lanes and sufficient vertical clearance on its bridges. Additionally, as the Houston metropolitan population continues to increase, TxDOT anticipates increased use of both U.S. 59 and Spur 527. Thus, TxDOT plans to begin a major reconstruction project on Spur 527.

The Spur 527 project is a component of the larger "Southwest Freeway Project" that began in the mid–1980's to reconstruct U.S. 59 from Beltway 8 to State Highway 288. The reconstruction of U.S. 59 and Spur 527 from Mandell to Smith Street[2] involves depressing a portion of U.S. 59 to a level 20 feet below grade, extending the existing High Occupancy Vehicle ("HOV") lanes into downtown, and reconstructing the travel lanes and bridges of Spur 527. On completion, U.S. 59 will be expanded to a 12 lane facility, including 5 lanes in each direction with a 2 lane HOV facility that will divert from U.S. 59 onto Spur 527 into downtown, and there will be two additional arched bridges over the freeway at Graustark and Montrose.

The overall Southwest Freeway Project was approved in October 1985[3] when TxDOT submitted and the Federal High-

way Administration approved a 1985 Environmental Impact Statement ("EIS").[4] In the early 1990's, TxDOT prepared an Environmental Assessment ("EA") detailing a plan to construct elevated HOV lanes along side Spur 527 into downtown.[5] However, after presentations at public hearings and community workshops, TxDOT redesigned this portion of the project due to significant public opposition concerning the project's lack of aesthetic appeal. Based on public comment, TxDOT's new design extends the depressed section of U.S. 59 to the intersection of Spur 527 and places HOV lanes at the same grade as the main lanes on the Spur, which now requires reconstruction of Spur 527 to align the two roadways. Additional public meetings were held to discuss TxDOT's new design plans.

In September 1997, TxDOT prepared a revised EA to address the new design. The 1997 EA stated that the proposed construction would not detour or divert significant levels of traffic onto neighborhood streets. As part of the EA, TxDOT provided documentation from the State Historical Preservation Officer ("SHPO") that stated the project would not have an adverse impact on neighborhood historical properties. On February 25, 1998, the FHWA issued a finding of no significant impact ("FONSI").[6]

---

2. The reconstruction of Spur 527 involves a 1.75 mile stretch of the overall 13.4 miles of the Southwest Freeway Project.

3. At that time, specific plans regarding reconstruction of Spur 527 did not exist.

4. An EIS is a detailed written statement as required by section 4332(2)(C) of NEPA, which specifically obligates all federal agencies to develop an EIS for any "major [f]ederal action" that will significantly affect "the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.11.

5. An EA is a concise public document prepared by the federal agency that serves to: (1)

briefly provide sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact ("FONSI"); (2) aid the agency in complying with NEPA when no EIS is necessary; and (3) facilitate preparation of an EIS when one is necessary. 40 C.F.R. § 1508.9.

6. A FONSI is a document prepared by the federal agency that presents the reasons why an action "will not have a significant effect on the human environment and for which an [EIS] therefore will not be prepared." 40 C.F.R. § 1508.13.

TxDOT divided construction on the U.S. 59/Spur 527 project into three phases. In 1999, TxDOT began construction on Phase One, which involved reconstructing and depressing the travel lanes of U.S. 59 from Shepard to Mandell. That segment is substantially complete. Phase Two primarily involves construction of the following: (1) southern half of the U.S. 59 main lanes, (2) temporary bridges at Graustark and Montrose, (3) northbound Spur 527 main lanes, (4) southbound Spur 527 frontage road, and (5) permanent Main Street exit ramp.[7] Phase Three is essentially a mirror image of Phase Two and provides for the construction of: (1) the northern half of the U.S. 59 main lanes, (2) southbound Spur 527 main lanes, and (3) permanent Graustark and Montrose arch bridges.[8]

In 2002, TxDOT submitted to the FHWA a re-evaluation of the U.S. 59/Spur 527 project that addressed further design considerations for Phase Two, the Mandell to Smith Street portion of the project. TxDOT sought the FHWA's concurrence regarding the 1998 FONSI that "no further environmental documentation or public involvement is required for this project," and the FHWA concurred in July 2002. Accordingly, TxDOT awarded the construction contract to a private contractor in August 2002 pursuant to its bidding process.[9]

At the time the contract was awarded, TxDOT's construction plan called for complete closure of Spur 527 for the duration of the project.[10] However, based on public requests, TxDOT reconsidered its decision to completely close Spur 527 and revised the project. By October 2002, TxDOT developed a plan which would allow at least one outbound lane to remain open at all times and two outbound lanes to remain open for half of the project.[11] Construction was scheduled to commence in February 2003 and last approximately 33 months. However, the City of Houston requested TxDOT suspend the project until after the Super Bowl festivities on February 1, 2004, and TxDOT accommodated the City's request. The start date for Phase Two of the U.S. 59/Spur 527 project was reset for February 13, 2004.

In anticipation of the upcoming construction project, TxDOT prepared a Supplemental Report detailing its U.S. 59/Spur 527 traffic control plan in January 2004. Under this plan, inbound traffic is detoured to a new Main Street exit off U.S. 59, a temporary ramp that is currently under construction.[12] From this ramp,

---

7. During Phase Two, all U.S. 59 traffic will be moved to the north side of the freeway. Spur 527 northbound will be closed until the end of the project. The Blodgett entrance ramp to westbound U.S. 59 will be closed. At the hearing, TxDOT indicated that outbound Spur 527 will have two lanes open for one-half of the project and one lane open for the entire project.

8. During Phase Three, all U.S. 59 traffic will be moved to the south side of the freeway. All southbound Spur 527 lanes will be closed. However, one lane will be temporarily open for southbound traffic on the northbound Spur 527 roadway.

9. Williams Brothers Construction Company was awarded the contract as it submitted the lowest bid, $71,109,488.10. To date,

Williams Brothers has completed approximately 40% of the project.

10. In April 2002, TxDOT developed a traffic control plan based on complete closure of Spur 527 that diverted traffic through the adjacent arterial streets. However, the April 2002 plan was later withdrawn when TxDOT revised the construction project to allow for at least one outbound lane to be available on Spur 527 at all times.

11. The additional cost of the revisions was over $3,000,000.00.

12. In order to open the Main Street exit ramp, TxDOT must remove support columns from underneath Spur 527. Therefore, a test period to determine the effect of this project on traffic is not possible as both the new Main

traffic can flow into downtown on Main or connect with several other downtown streets, such as Fannin and San Jacinto. In addition, a U-turn lane from the Main Street ramp onto Garrott Street provides access to Travis Street. Inbound U.S. 59 traffic proceeding past the Main Street exit may use exits at Gray and Polk Streets. Spur 527 will continue to be accessible to outbound downtown traffic. Additionally, TxDOT and the City of Houston worked in conjunction to facilitate the flow of traffic onto U.S. 59 southbound via Webster Street. Pursuant to its revised traffic control plans, TxDOT does not purposefully direct the detour of traffic onto any adjacent arterial or neighborhood streets.[13]

To evaluate its traffic control plans and the resulting impact on traffic in the area, TxDOT requested the Texas Transportation Institute ("TTI"), which is affiliated with Texas A & M University, conduct a level-of-service ("LOS") study.[14] TTI's study concluded that, under the current traffic control plan, the LOS on arterial streets in the neighborhoods near Spur 527 will remain relatively the same during construction as prior to construction.[15] TxDOT provided a Supplemental Report to the FHWA outlining its revised traffic control plan. TxDOT also submitted the revised traffic control plan to the State Historical Commission for review. Subsequently, on January 29, 2004, the State Historic Preservation Officer concurred that TxDOT's traffic control plan would not have significant adverse effects on neighborhood historical properties.

TxDOT publicized its initial and revised traffic control plan via a series of informational meetings and talks during late 2002 through January 2004. After thorough evaluation of the traffic control plan and other possible alternatives, TxDOT's 2004 Supplemental Report concluded that the current traffic control plan minimizes construction impacts to the extent practicable and is consistent with the FHWA's FONSI, such that no further environmental evaluation is required. Therefore, TxDOT is prepared to proceed with construction of Phase Two.

### CURRENT LAWSUIT

Plaintiff West Alabama Quality of Life Coalition ("WALQ") filed the instant action on December 8, 2003, alleging that Defendants United States Federal Highway Administration; Curtis Dan Reagan in his Official Capacity as Division Administrator of the U.S. Federal Highway Administration, Texas Division; Mary E. Peters in her Official Capacity as Administrator of the U.S. Federal Highway Administration; United States Department of Transportation; Norman Y. Mineta, in his Official Capacity as Secretary of Transportation of the United States Department of Transportation; Texas Transportation Commission; John W. Johnson in his Official Capacity as Commissioner of the Texas Transportation Commission; the City of Houston; Lee P. Brown in his Official

---

Street exit and the inbound section of Spur 527 cannot be utilized simultaneously. TxDOT stated that some outbound lanes will remain open on Spur 527, but all inbound lanes will be closed during the project.

**13.** At the hearing, TxDOT conceded that drivers may, of their own accord, choose arterial or neighborhood streets as an alternative to TxDOT's proposed routes. However, TxDOT's January 2004 traffic control plan does not call for the diversion of traffic onto adjacent streets.

**14.** The LOS scale grades traffic from A (free flowing) to F (extreme congestion).

**15.** The arterial streets at issue are primarily those running parallel to U.S. 59 and providing access to the central business district, such as Westheimer, West Alabama, Richmond, and Bissonnet.

Capacity as Mayor of Houston; Metropolitan Transit Authority of Harris County, and Shirley A. Delibero in her Official Capacity as President and Chief Executive Officer of the Metropolitan Transit Authority of Harris County failed to comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370f(2000), the National Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 470–470x–6(2000), and the Administrative Procedures Act ("APA"), 5 U.S.C. § 706 *et seq.* (2000).[16] As relief, Plaintiff seeks a permanent injunction to halt the construction project on U.S. 59/Spur 527 until Defendants comply with the NEPA, NHPA, and APA statutory requirements. On January 20, 2004, WALQ filed its First Amended Complaint.

Specifically, WALQ argues that Defendants failed to comply with the NEPA and NHPA by failing to fully analyze all impacts of TxDOT's traffic control plan on neighboring communities and failing to involve the public in the formation of the construction plan. WALQ contends that the project will cause a major disruption of traffic flow in and out of the central business district. WALQ also claims that the FHWA and TxDOT failed to evaluate the impact of that traffic on the surrounding neighborhoods. Accordingly, on January 26, 2004, WALQ filed its Motion for Preliminary Injunction seeking to enjoin Defendants from proceeding with Phase Two of the U.S. 59/Spur 527 reconstruction project either permanently or until additional environmental and historical analyses, including indirect and/or secondary impacts of traffic diversion, are completed.

In response, Defendants contend that they are in full compliance with all the NEPA, NHPA, and APA statutory requirements and oppose WALQ's preliminary injunction request. In support of their position that they have fully complied, Defendants submitted a partial Administrative Record including the 1985 Final Environmental Impact Statement ("FEIS"), July 1991 EA[17], 1997 Revised EA, 1998 FONSI, 2002 Re–Evaluation, and January 15, 2004 Supplemental Report.

*LAW AND ANALYSIS*

▉ As stated previously, a preliminary injunction's purpose is to preserve the status quo, prevent irreparable injury to the parties, and "preserve the court's ability to render a meaningful decision" after a trial on the merits. *Meis,* 511 F.2d at 656 (5th Cir.1975); *see also Hollon v. Mathis Indep. Sch. Dist.,* 491 F.2d 92, 93 (5th Cir.1974). Thus, a court may grant a preliminary injunction, even though the outcome of the lawsuit itself is uncertain. *See Meis,* 511 F.2d at 656; *Lakedreams v. Taylor,* 932 F.2d 1103, 1107 (5th Cir.1991). A preliminary injunction is an extraordinary remedy and must be supported by specific findings of the court. *Placid Oil Co. v. United States Dept. of Interior,* 491 F.Supp. 895, 904 (N.D.Tex.1980).

▉ In this case, Plaintiff WALQ has the heavy burden to clearly show that a preliminary injunction should be granted. *Lakedreams,* 932 F.2d at 1107; *Kern River Gas Transmission v. Coastal Corp.,* 899 F.2d 1458, 1462 (5th Cir.1990); *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.,* 878

---

**16.** On January 29, 2004, Plaintiff filed a Notice of Dismissal Without Prejudice as to the following Defendants: (1) City of Houston; (2) former Mayor Lee P. Brown in his Official Capacity; (3) Metropolitan Transit Authority of Harris County; and (4) Shirley A. Delibero

in her Official Capacity as President and Chief Executive Officer of the Metropolitan Transit Authority of Harris County.

**17.** The July 1991 EA was revised in March 1992, August 1992, and October 1992.

F.2d 806, 809 (5th Cir.1989); *Hardin v. Houston Chronicle Publ'g Co.*, 572 F.2d 1106, 1107 (5th Cir.1978). Thus, to successfully obtain a preliminary injunction, WALQ must demonstrate: (1) a substantial likelihood of success on the merits of its claim; (2) a substantial threat of irreparable injury or harm for which there is no adequate remedy at law; (3) that the threatened injury to WALQ outweighs any harm that the injunction might cause to Defendants; and (4) that the injunction will not disserve the public interest. *DSC Communications Corp. v. DGI Techs., Inc.*, 81 F.3d 597, 600 (5th Cir.1996); *Cherokee Pump & Equip., Inc. v. Aurora Pump*, 38 F.3d 246, 249 (5th Cir.1994); *Canal Auth. of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir.1974).

■ The decision over whether to grant or deny a preliminary injunction is within the discretion of the district court and may be reversed on appeal only for an abuse of discretion. *Allied Mktg. Group, Inc.*, 878 F.2d at 809; *Canal Auth. of Florida*, 489 F.2d at 572. Relief must be denied unless the facts and law clearly favor the moving party. *See id.* at 573. Therefore, if WALQ fails to meet its burden on any one of the four required elements, this Court must deny injunctive relief. *Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir.1985); *see also Clements Wire & Mfg. Co. v. NLRB*, 589 F.2d 894, 897 (5th Cir. 1979). The Court will address each element of a preliminary injunction in turn.

A.  *Success on the Merits*

To obtain a preliminary injunction, Plaintiff must first show a substantial likelihood that it would succeed on the merits of its claims once the case proceeds to a full and complete trial. *Lakedreams*, 932 F.2d at 1107. To clarify, "[a] party seeking a preliminary injunction does not have to prove its claims at this stage of the proceedings, only that it is likely to succeed on the merits." *Puerto Rico Conservation Found. v. Larson*, 797 F.Supp. 1066, 1070 (D.Puerto Rico 1992). Therefore, WALQ must demonstrate to this Court a substantial likelihood that it would succeed on the merits of its National Environmental Policy Act, National Historic Preservation Act, and Administrative Procedures Act claims at trial.

1.  *National Environmental Policy Act*

The goal of NEPA is to protect the environment by requiring federal agencies to evaluate significant environmental impacts before undertaking major actions. *See* 42 U.S.C. § 4321 (2000); 42 U.S.C. § 4332(2) (2000). Therefore, NEPA endeavors to "ensure that government agencies act on full information and that interested groups have access to such information." *Sierra Club v. Forest Serv.*, 46 F.3d 835, 837 n. 2 (8th Cir.1994). NEPA requires federal agencies to take a "hard look" at the environmental consequences of their actions and consider reasonable alternatives. *See* 42 U.S.C. §§ 4321–4370f; *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976); *see also Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir.2000) (indicating the court's role is to ensure that agencies take a "hard look" at the environmental consequences of their actions by disclosing all of the environmental impacts).

During the NEPA process, agencies may prepare an EIS, which includes a review of all the reasonably foreseeable environmental impacts associated with the federal agency's contemplated actions. 42 U.S.C. § 4332(2)(C). To determine whether an EIS is called for, agencies often prepare an EA, which is not as detailed as an EIS, but includes an examination of the environmental impacts of the project and

potential alternatives. *See* 40 C.F.R. § 1508.9. If the EA concludes that the impacts of the proposed action will be significant, an EIS is required. *Id.* If the impacts are not significant, a finding of no significant impact ("FONSI") may be issued allowing the project to begin, and no additional NEPA analysis is required by the agency unless the conclusions of the EA are successfully challenged. *See* 40 C.F.R. §§ 1508.9, 1508.13.

■ Thus, NEPA mandates the procedures by which agencies must consider the environmental impacts of their actions, but it does not dictate the substantive results of that consideration. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349–50, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989); *Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 371, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *see also Tillamook County v. United States Army Corps of Eng'rs,* 288 F.3d 1140, 1143 (9th Cir.2002); *Goos v. I.C.C.,* 911 F.2d 1283, 1293 (8th Cir.1990). As a procedural statute, NEPA requires that federal agencies assess the environmental consequences of federal actions. *See Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). While the procedural requirements of NEPA are to be strictly complied with, the court has discretion to decline an injunction even where deviations from prescribed procedures have occurred. *Town of Huntington v. Marsh,* 884 F.2d 648, 653 (2d Cir.1989).

### 2. *National Historic Preservation Act*

The NHPA was enacted to encourage the preservation and protection of the United States' historic and cultural resources. *See* 16 U.S.C. § 470 (2000). The Act recognizes that historic properties are being lost or substantially altered and preservation is in the public interest. *Id.* However, like the NEPA, the NHPA is a procedural statute. *See* 16 U.S.C. §§ 470–470x–6. The statute does not create an obligation to preserve or mitigate damage to any historic property. *See id.* The NHPA process merely requires Defendants assess the adverse effects of any "undertaking." 16 U.S.C. § 470f (2000).

Specifically, the Act mandates that agencies involved in expending federal funds on a project must, prior to the utilizing the funds, "take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register." *Id.* NHPA analyses may be conducted simultaneously with NEPA analyses. 36 C.F.R. § 800.8. If an undertaking will affect historical properties, agencies are to consult with the State Historic Preservation Officers ("SHPO"). 16 U.S.C. § 470a(b)(3)(I) (2000). If a federal agency fails to comply with NHPA's procedural steps, affected individuals may seek judicial enforcement. *See* 16 U.S.C. § 470; *Presidio Golf Club v. Nat'l Park Serv.,* 155 F.3d 1153, 1158–60 (9th Cir.1998).

### 3. *Administrative Procedures Act*

While Plaintiff's complaint alleges that Defendants' proposed actions violate the NEPA and NHPA, these statutes do not provide independent causes of action. 5 U.S.C. § 701 *et seq.* (2000); *see, e.g., Lujan v. Nat'l Wildlife Fed.,* 497 U.S. 871, 882, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *ONRC Action v. Bureau of Land Mgmt.,* 150 F.3d 1132, 1135 (9th Cir.1998). Therefore, this Court must review Defendants' conduct under the guise of the Administrative Procedures Act ("APA"). *Id.*

■ The APA provides for judicial review of challenges to final agency action. *See* 5 U.S.C. § 701 *et seq., Sierra Club v. Glickman,* 67 F.3d 90, 96 (5th Cir.1995); *Sierra Club v. Yeutter,* 926 F.2d 429, 439–40 (5th Cir.1991); *Avoyelles Sportsmen's*

*League, Inc. v. Marsh,* 715 F.2d 897, 904 (5th Cir.1983); *Nat'l Wildlife Fed'n v. Coleman,* 529 F.2d 359, 371–72 (5th Cir. 1976). Section 706(2)(A) of the APA directs a reviewing court to affirm final agency action, unless that action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accord with the law." 5 U.S.C. § 706(2)(A) (2000); *Citizens to Pres. Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Furthermore, the APA places the burden of proof on the plaintiff to show the defendant agency's action should be overturned. *See Public Citizen v. U.S. E.P.A.,* 343 F.3d 449, 455 (5th Cir.2003); *Sierra Club v. Marita,* 46 F.3d 606, 617 (7th Cir.1995).

■■■ Under the APA, judicial review of agency action is narrow in scope and designed to determine whether the agency has examined all relevant data and provided a reasoned explanation of its decision. *See Marsh v. Or. Nat. Res. Council,* 490 U.S. 360, 377, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Di Vosta Rentals, Inc. v. Lee,* 488 F.2d 674, 678 (5th Cir.1973). In a broad sense, courts are not to determine the correctness of an agency's action, but whether the challenged action is legal. *See Di Vosta Rentals, Inc.,* 488 F.2d at 678. Thus, a reviewing court may not substitute its own judgment for that of the agency. *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council,* 435 U.S. 519, 555, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); *Citizens to Pres. Overton Park, Inc.,* 401 U.S. at 410, 91 S.Ct. 814. If the Court is satisfied with the agency's review of the issue, no further inquiry is required. *See Stop H–3 Assoc. v. Dole,* 740 F.2d 1442, 1464–65 (9th Cir.1984).

Here, Plaintiff WALQ argues Defendants must evaluate the environmental impacts of their proposed action, including the diversion of traffic, either intentionally or unintentionally, from the U.S. 59/Spur 527 construction zone onto city streets and failure to do so violates 5 U.S.C. § 706(2)(A). Plaintiff asserts that traffic will inevitably divert and impact residential areas as well as institutions, businesses, and historical districts adjacent to the affected city streets. WALQ contends that Defendants wholly failed to analyze this increase in traffic in any of their NEPA or NHPA documentation, which was a reasonably foreseeable impact of the proposed project. Further, Plaintiff argues that, under NEPA, transportation impacts caused by construction activities are required to be analyzed in the environmental documentation.[18] WALQ contends that Defendants' 1991 EA and its 2002 Re-Evaluation are insufficient because they do not address the indirect or secondary impacts of the construction project on traffic. Thus, Plaintiff maintains these allegations illustrate violations of NEPA and the APA.

Plaintiff refers the court to two federal regulations, 40 C.F.R. § 1502.16(b) and 40 C.F.R. § 1508.8(b), to support its position that NEPA requires the agencies to present and analyze a detailed traffic control plan as part of the indirect or secondary construction impacts set out in an EIS. Section 1502.16 generally sets forth the types of considerations and discussions that must be addressed in an EIS, and section (b) specifically illustrates that "[i]ndirect effects and their significance" must be addressed. 40 C.F.R. §§ 1502.16 & 1502.16(b). "Effects" includes both direct and indirect effects. 40 C.F.R. § 1508.8.

---

18. As support for its position, WALQ cites to 40 C.F.R. § 1508.8(b); § 1502.16(b); and *Cobble Hill Ass'n v. Adams,* 470 F.Supp. 1077, 1088 (E.D.N.Y.1979) (stating that the federal defendants were obligated to consider, assuming any NEPA obligations attached, traffic detour and dispersion plans to mitigate the effects of a possible increase in local traffic).

Indirect effects are those "which are caused by the action and are later in time or father removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b). Indirect effects includes "growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." *Id.* The terms "effects" and "impacts" are used interchangeably in the regulations and include ecological, aesthetic, historic, cultural, economic, social, or health effects, whether direct, indirect, or cumulative. *Id.*

Defendants counter that neither of these regulations require agencies to present and analyze a detailed traffic control plan as an indirect or secondary construction impact. Defendants rebut the cases cited by Plaintiff arguing they do not address the issue of temporary construction impacts.[19] Defendants direct the Court to its multiple revisions of the U.S. 59/Spur 527 project as evidence that it did consider the impact of traffic diversion. TxDOT argues that it made extensive efforts to address temporary construction impacts including the 1985 EIS, 1997 EA, 2002 Re–Evaluation, and TTI analysis, which all showed that there will be no significant deterioration in the LOS on the arterial streets adjacent to Spur 527 during the reconstruction project. Defendants maintain these activities exceed the minimum requirements called for by NEPA.

Defendants also refer the Court to 23 C.F.R. § 771.113(a), which states that "final design activities ... shall not proceed until" either the action is classified as a categorical exclusion, a FONSI has been approved, or a final EIS has been approved. Because Defendants argue that traffic control plans fall within the auspices of final design activities, they were not required to analyze this information in an EA or EIS. Further, Defendants maintain that NEPA does not require the setting forth of detailed traffic control plans in environmental documents. *See City of Alexandria v. Slater,* 198 F.3d 862, 869–70 (D.C.Cir.1999); *see also Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 353, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989) (stating "it would be inconsistent with NEPA ... to demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act").

Judicial review of the agencies' EA, EIS, or FONSI under the APA is limited to determining whether the agencies' decisions were arbitrary, capricious, or an abuse of discretion. *See TOMAC v. Norton,* 240 F.Supp.2d 45, 46–47 (D.D.C.2003) (citing *Public Citizen v. Nat'l Highway Traffic Safety Admin.,* 848 F.2d 256, 266–67 (D.C.Cir.1988)). Based on the partial administrative record provided, arguments of counsel at hearing, and applicable law, this Court determines that Defendants complied with the NEPA process. Accordingly, Defendants' decisions regarding the preparation and contents of their EA, EIS, or FONSI cannot be classified as arbitrary, capricious, or an abuse of discretion.

In addition to NEPA violations, Plaintiff also contends that Defendants' failure to assess the adverse effects of the construction project on the surrounding historical districts violates the NHPA, 16 U.S.C. § 470f (2000). Plaintiff argues Defendants

19. Plaintiff cites to the following cases as support for its evaluation of indirect impacts: *See Coalition for Canyon Pres. v. Bowers,* 632 F.2d 774 (9th Cir.1980); *N. Crawfish Frog v. Fed. Highway Admin.,* 858 F.Supp. 1503 (D.Kan. 1994); *Rankin v. Coleman,* 394 F.Supp. 647 (E.D.N.C.1975).

lack of analysis is arbitrary and capricious under the APA.

Defendants cite to the 1985 EIS, 1991 EA, 1997 EA, and 2002 Re–Evaluation as evidence that the agencies addressed and demonstrated compliance with NHPA requirements. In addition, Defendants received approval from the State Historical Preservation Officer ("SHPO") and provided a recent letter to the Texas Historical Commission that Defendants will continue to assure compliance with 16 U.S.C. § 470f. In its analysis, Defendants identified areas listed on the National Historic Register and considered the impact of the project on those areas.

This Court finds that Defendants' NHPA analysis appropriate. Plaintiff failed to present any evidence that Defendants' acts would have an adverse impact on any sites or objects listed on the National Historic Register. Further, at the hearing, Plaintiff presented only one witness, Mr. Peter Brown, to briefly address land use impacts and the potential harm that an increase in traffic level-of-service ("LOS") would cause. At no time did Plaintiff address specific issues related to historic properties or sites other than to argue that the increase in traffic and resultant environmental consequences may have an impact on historical areas. In essence, Plaintiff did not show that Defendants' NHPA analyses were violative of § 706 of the APA.

■ Furthermore, an agency's acts satisfy the statutory requirement that the federal agency take into account the effect of the undertaking on any registered site or objects when the agency receives a concurrence by the State Historical Preservation Officer ("SHPO") as well as implemented efforts to mitigate the impacts. *See, e.g., Sierra Club v. Clark,* 774 F.2d 1406, 1410 (9th Cir.1985). Here, the Defendants received a concurrence from the Texas SHPO. Based on the foregoing, this Court determines that Defendants properly evaluated the effect of the undertaking as required by 16 U.S.C. § 470f, and Defendants' decisions regarding the NHPA process were not arbitrary, capricious, or an abuse of discretion.

### 4. *Conclusion Regarding Success on the Merits*

■ Despite Plaintiff WALQ's arguments to the contrary, this Court determines that Defendants have fully complied with both NEPA and NHPA. Defendants' actions were not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, thus, not in violation of § 706(2)(A) of the APA. Therefore, the Court finds Plaintiff has not shown it is substantially likely to succeed on the merits of its claims once the case proceeds to a full and complete trial. Notwithstanding this determination, the Court will also address the parties' remaining arguments with respect to a preliminary injunction.

### B. *Irreparable Harm*

■ In addition to showing success on the merits of its claim, WALQ must also show that it will suffer irreparable harm if an injunction is not granted. *DSC Communications Corp.,* 81 F.3d at 600; *Cherokee Pump & Equip., Inc.,* 38 F.3d at 249. To establish a substantial threat of irreparable injury or harm, WALQ must clearly show some concrete injury or environmental harm resulting from the Defendants' actions. *See Fund for Animals v. Clark,* 27 F.Supp.2d 8, 14 (D.D.C.1998); *George Washington Home Owners Ass'n v. Widnall,* 863 F.Supp. 1423, 1427 (D.Colo.1994). To be considered irreparable, the injury must be permanent or of long duration. *Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987); *see also Canal Auth. of Florida,* 489 F.2d at 577. Irrepa-

rable harm is also considered to be a harm that cannot be redressed by either an equitable or legal remedy following trial. *Acierno v. New Castle County,* 40 F.3d 645, 653 (3d Cir.1994). Irreparable harm is neither speculative nor remote, but is actual and imminent. *See United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). This element is met if WALQ can prove it is likely to suffer this type of harm before a trial on the merits. *Puerto Rico Conservation Found.,* 797 F.Supp. at 1071.

Here, Plaintiff represents that irreparable harm will occur because it will be impossible to revert to the status quo once Phase Two of the construction project is underway.[20] Plaintiff also represents that the increased level of traffic on city streets as a side-effect of the construction project will result in permanent damage to neighborhoods adjacent to West Alabama and Richmond streets. Plaintiff further contends that the resultant increase in traffic on adjacent city streets may lead to sudden, irreversible impacts to land uses adjacent to city streets. Last, Plaintiff states that the potential increase in traffic raises the likelihood that citizens working and residing in these adjacent neighborhood areas may suffer personal injury or death, which amounts to irreparable harm.

Plaintiff argues these are the harms that NEPA is designed to prevent, especially when agencies, like Defendants, make decisions without considering the information that the NEPA and NHPA seeks to place before the decision-maker and the public. *Sierra Club v. Marsh,* 872 F.2d 497, 500 (1st Cir.1989). When the opportunity to review environmental factors is lost, WALQ asserts that the harm is irreparable and an injunction is necessary to preserve the decision-making process. *Ass'n*

*Concerned About Tomorrow, Inc. v. Dole,* 610 F.Supp. 1101, 1119 (N.D.Tex.1985). Thus, WALQ contends there is a presumption of harm because of Defendants' alleged violation of NEPA's procedures requiring informed decision-making. *Marsh,* 872 F.2d at 500.

This Court notes that in environmental litigation, other courts have granted preliminary injunctions. *Canal Auth. of Florida,* 489 F.2d at 574 (citing *W. Va. Highlands Conservancy v. Island Creek Coal Co.,* 441 F.2d 232 (4th Cir.1971); *Boston Waterfront Residents Ass'n, Inc. v. Romney,* 343 F.Supp. 89 (D.Mass.1972); *Scherr v. Volpe,* 336 F.Supp. 882 (W.D.Wis.1971)). However, "preliminary injunctions have been issued not merely because some impact upon the environment has been alleged, but because the threatened harm has been properly shown to be irreparable." *Id.* If the plaintiff does not allege and prove an irreparable harm, the court may deny injunctive relief. *Id.*

Here, while there may be temporary effects of the construction project such as inconvenience, increased traffic, and increased noise and air pollution felt by both citizens who work and reside within proximity of the project and commuters who traverse U.S. 59 and Spur 527, the project has a life expectancy of 33 months, which is not permanent or of long duration. Aside from its arguments concerning traffic congestion, WALQ did not present any evidence that Defendants failed to fully assess other potential environmental harms. Furthermore, WALQ failed to clearly show a concrete injury or environmental harm that would result from the Defendants' actions. WALQ presented no evidence of increased air or noise pollution. Therefore, the Court determines that

---

**20.** However, the Court notes that Plaintiff's primary complaint is not with the construction project itself, but with the resultant effects of the construction project on traffic in the U.S. 59/Spur 527 vicinity.

WALQ failed to establish the second prong necessary for a preliminary injunction by not showing that the alleged harm created by Defendants proceeding with the U.S. 59/Spur 527 project is irreparable.

## C. *Balancing of the Equities*

■ The third element required for a preliminary injunction is the balancing of the equities. *DSC Communications Corp.*, 81 F.3d at 600; *Cherokee Pump & Equip., Inc.*, 38 F.3d at 249. Here, the court evaluates the severity of the impact on Defendants if the temporary injunction be granted and the hardship that would occur to WALQ if the injunction is denied. *See id.* Likewise, in balancing the interests of the parties, courts consider the competing claims of injury and must balance the hardships on each party of either granting or withholding the requested relief. *Pappan Enters. v. Hardee's*, 143 F.3d 800, 805 (3d Cir.1998).

In the case-at-hand, Plaintiff WALQ argues that the balance of equity favors granting a preliminary injunction because environmental injury is likely to occur. In contrast, Defendants contend that the harm suffered by WALQ does not clearly outweigh the harm suffered by Defendants. At the hearing, Defendants testified that, if an injunction is granted, TxDOT will lose $7.5 million dollars as a result of a six month to one year delay in the construction project due to increased cost of contract materials from the time of contract negotiation.[21] In addition, Defendants' testimony at the hearing plainly stated that this Phase Two portion of the entire Southwest Freeway Project will need to be completed at some point due to

aging bridges, increasing costs to repair existing structures,[22] inadequate shoulder space on Spur 527, lack of appropriate clearance levels under existing bridges, and the need to extend the HOV lanes to accommodate the city's growth and expected increased traffic flow on the Southwest Freeway.

■ After weighing the potential injury and hardships of each party, the Court determines that Plaintiff fails to demonstrate that the balance of equities affirmatively tips in its favor. Therefore, Plaintiff has failed to establish the third element needed for a preliminary injunction.

## D. *Public Interest*

The final factor a court considers in its decision to grant or deny a preliminary injunction is whether an injunction is in the public interest. *DSC Communications Corp.*, 81 F.3d at 600; *Cherokee Pump & Equip., Inc.*, 38 F.3d at 249. Thus, WALQ must show that it is in the public interest to enjoin construction on Phase Two of the U.S. 59/Spur 527 project.

When deciding whether to issue an injunction, courts must remain mindful of the public consequences. *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). While courts have generally found that the public interest in requiring agencies to comply with NEPA prior to a project proceeding is sufficient to warrant an injunction, "there is no general presumption that an alleged NEPA violation will in all cases outweigh other public interests." *Provo River Coalition v. Pena*, 925 F.Supp. 1518, 1525 (D.Utah 1996) (citing *Fund for Ani-*

---

**21.** This Court notes that some courts have utilized excessive delay or costs as a factor in denying a preliminary injunction. *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 512–14 (9th Cir.1988); *Southwest Williamson County Cmty. Ass'n Inc. v. Slater*, 67 F.Supp.2d 875, 885–86 (M.D.Tenn.1999);

*Texas v. United States Forest Serv.*, 654 F.Supp. 289, 295 (S.D.Tex.1986).

**22.** At the hearing, TxDOT estimated maintenance and repair costs on Spur 527 at approximately $350,000 in 2002 and $400,000–$450,000 in 2003.

*mals, Inc. v. Lujan,* 962 F.2d 1391, 1400 (9th Cir.1992); *Concerned Citizens, etc. v. Sec'y of Transp.,* 641 F.2d 1, 7–8 (1st Cir.1981); *Thompson,* 811 F.Supp. at 641); *see also Realty Income Trust v. Eckerd,* 564 F.2d 447, 456 (D.C.Cir.1977); *S. Utah Wilderness Alliance v. Thompson,* 811 F.Supp. 635, 641 (D.Utah 1993).

Here, Plaintiff WALQ argues it is in the public interest to halt construction so that Defendants may more fully comply with NEPA, NHPA, and APA requirements. Defendants respond that they have fully complied with the respective statutory procedures. Defendants also argue that traffic control plans are not a crucial step in the NEPA process.

█ In support of their position, Defendants adequately demonstrated a thorough review of all available options regarding construction design and minimizing construction impacts. Defendants provided the Court with a partial administrative record, informal studies, and a formal study from TTI, all of which indicate the effect of this project on traffic in the adjacent areas will not drastically increase from its present level-of-service. While Defendants are unable to assure this Court or the community that traffic will not divert into the surrounding city streets, Defendants indicated that their overall construction management plan will attempt to prevent that occurrence by continuously providing information via various media outlets to educate the driving public regarding alternate routes, additional exits available on U.S. 59, available lanes on Spur 527, and mass-transit options.[23] Defendants will also maintain availability of an internet website displaying up-to-date traffic conditions, routes available, and current construction status.[24]

After considering the public consequences of halting this project as a whole and not just the consequences to the individual parties before the Court, this Court determines that a preliminary injunction is not in the public interest at the present time. Thus, Plaintiff failed to establish the final prong essential to a preliminary injunction.

## CONCLUSION

From the outset, Plaintiff WALQ had the burden of proof to establish all four prerequisites of a preliminary injunction. Initially, WALQ had to demonstrate to the court that it would likely succeed on the merits of its lawsuit, and, to do so, WALQ also carried the burden of demonstrating Defendants' acts were a violation of the Administrative Procedures Act ("APA"). Because this Court found that Defendants' acts are not a violation of the APA, Plaintiff failed to show a substantial likelihood of success on the merits. Therefore, Plaintiff is not entitled to a preliminary injunction. Despite this initial failure, the Court further determined that Plaintiff did not meet its burden on the three remaining elements necessary to obtain a preliminary injunction. Accordingly, the Court hereby

ORDERS that Plaintiff's Motion for Preliminary Injunction is DENIED.

---

**23.** The Court found the testimony of Mr. Gilbert Johnson, Director of Transportation Planning and Development for TxDOT's Houston District, regarding the overall construction project and TxDOT's commitment to ongoing monitoring of traffic management and construction management to be especially credible. TxDOT's counsel, Mr. Jack F. Gilbert, assured the Court that Mr. Johnson will personally continue to honor that commitment during the entire evolution of this 33 month project.

**24.** The website address is http://traffic.houstontranstar.org/us59–spur527/.